UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLOBAL EQUIPMENT COMPANY, INC.,<br><br>Plaintiff & Counterclaim-Defendant,<br><br>-against-<br><br>TEREX SOUTH DAKOTA, INC.,<br><br>Defendant & Counterclaim-Plaintiff. | No. 25-CV-6480 (LAP)<br><br>OPINION AND ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Plaintiff and Counterclaim-Defendant Global Equipment Company, Inc.'s ("Global") motions to dismiss Terex South Dakota, Inc.'s ("Terex") first amended counterclaims and strike Terex's affirmative defenses.[1] For the reasons set forth below, Global's motion is DENIED.

## BACKGROUND

The following facts are drawn from Terex's FAC and presumed true for the purposes of this motion.

### A. The Parties

Terex is a Delaware corporation that has sold elevating work platforms and lift equipment—scissor, boom, and vertical lifts—under the GENIE brand since 1966. (FAC ¶¶ 2-3, 9.) Terex's

[1] See First Amended Counterclaim (Dkt. 27 ("FAC")). "Compl." refers to Global's original complaint at Dkt. 4. The Court has also considered Global's memorandum, Dkt. 29 ("Mot."); Terex's opposition, Dkt. 31 ("Opp."); and Global's reply, Dkt. 32 ("Reply").

powered products include mobile elevating work platforms, or "MEWPs." In addition to the much larger MEWPs, Terex also sells a 400-pound-capacity manual lift. (Id. ¶¶ 10, 13.)

Global is a New York corporation and a distributor of industrial and maintenance supplies whose products also include 400-pound-capacity lift trucks. (FAC ¶¶ 4, 34-35.)

**B. The Genie Blue Trade Dress**

Terex alleges that its products are identified by a color scheme combining a shade of blue it calls "GENIE BLUE" with gray, (FAC ¶¶ 3, 12), and defines the dress as follows:

> The Genie Blue Scheme consists of the following elements: (1) use of GENIE BLUE; (2) the use of the color gray; and (3) the colors on different sections of lifting devices such as MEWPs and manual lifting devices.

(FAC ¶ 12.) The FAC provides photographs of three exemplar Genie MEWPs and of the Genie manual lift:





(FAC ¶¶ 12-13.) Elsewhere, the FAC describes the goods as identifiable by a unique blue with gray accents. (Id. ¶ 32.)

Terex alleges continuous and exclusive use of the Genie Blue Scheme throughout the United States, including New York, since the mid-1980s, and annual advertising of $1 million to $4 million for products featuring it. As one example, the FAC identifies an advertisement describing Genie Blue as the "Color of Confidence" and urging consumers to "Think Blue":




(FAC ¶¶ 14-16.) Terex further alleges that the Genie Blue Scheme stands out in a construction market where most equipment is yellow, orange, or red. Terex also sells at least $1 billion of products bearing the Genie Blue Scheme annually in the United States and asserts that Genie-branded products hold first- or second-place market share in every MEWP class. Accordingly, Terex asserts that

purchasers understand the Genie Blue Scheme to convey that a product was produced by the Terex-owned GENIE brand. (FAC ¶¶ 17–20, 27.)

Moreover, Terex contends that the Genie Blue Scheme is not functional because it does not affect cost, quality, or use, and serves no function other than branding. (FAC ¶¶ 22–24, 30.) Competitors, according to Terex, remain free to choose other colors for their own lifts. As examples, the FAC depicts competing MEWPs that are sold in orange, yellow, and red, some of which are sold by Global (shown in the image at right):






(FAC ¶¶ 25–26.) Indeed, Terex alleges that color differentiation is essential for product identification because these machines are often seen from a distance at construction sites and rental yards, where the manufacturer's name cannot be read and color is the most prominent feature. (Id. ¶ 31.)

### C. Global's Alleged Infringement of the Genie Blue Trade Dress

Against that backdrop, Terex alleges that Global has now copied the Genie Blue Scheme on its hand-operated lift trucks in a way that is likely to trick consumers into confusing Global's

lifts with those of Terex. To that end, Global's lifts use a combination of blue and gray colors that largely mirror the arrangement of colors on Terex's Genie-branded lifts. The FAC shows screenshots of both Terex's original lift and Global's alleged copycat, and Global's own complaint separately includes a larger webpage screenshot of the same lift:[2]

**Terex** **Global**






Beyond Global's alleged attempt to copy the Genie Blue Scheme on its hand lifts, Terex alleges that Global has also purchased the term "Genie Lift" as a Google search term, meaning that a search for the "Genie Lift" term returns an alleged Global look-alike among the top results. (FAC ¶ 37.) Combined with the similarity of the color schemes, Terex alleges, the search results make it likely that an inattentive consumer will believe that the Global

[2] The FAC does not specifically label the two lifts, although the FAC elsewhere identifies the image on the left as Terex's manual lift, (FAC ¶ 13). The lift on the right is identified as Global's lift in Global's complaint. (Compl. ¶ 31).

lift is associated with Terex's Genie-branded lifts:[3]




Terex further alleges that Global's products are of unknown quality and are sold at a significantly lower price. Finally, Terex contends that, as evidenced by Global's purchase of the Genie keyword, Global's infringing products are offered with actual and constructive notice of Terex's claimed Genie Blue Scheme trade dress.[4] (Id. ¶¶ 40, 45.)

**D. Procedural Background**

In May 2024, Terex sent Global a cease-and-desist letter asserting rights in GENIE BLUE as a color used exclusively by Genie since at least 1984. The letter identified at least three Global

[3] The FAC calls the search-term purchase evidence that Global adopted the Genie Blue Scheme "in good faith." (FAC ¶ 38.) Given the surrounding bad-faith allegations, (id. ¶¶ 39, 44-45, 67), the Court treats that phrase as a drafting error. The FAC also calls its Lanham Act claim "Count II" in its jurisdictional allegations, (id. ¶ 5), though it is pleaded as Count I. The Court also assumes this to be a typo.

[4] The FAC pleads no registered mark as to hand lifts. Global's Complaint identifies six Terex registrations, each claiming blue as applied to specified components of a MEWP, which Global has petitioned to cancel before the Trademark Trial and Appeal Board. (Compl. ¶¶ 24 & n.1, 27.) Those MEWP registrations are not asserted in the FAC and are not before the Court.

lift trucks and demanded that Global cease all use of blue on its lifting equipment. (Compl. ¶¶ 15-16; Dkt. 4-1 at 2-3.)

After the parties failed to resolve the dispute, Global filed this action seeking a declaratory judgment that its blue lift equipment does not infringe Terex's trade dress and that Terex has no rights in blue beyond its registered configurations for MEWPs. (Dkt. 1; Compl. ¶¶ 54-62.) Terex promptly counterclaimed, (Dkt. 18), after which Global moved to dismiss the counterclaims and to strike Terex's affirmative defenses. (Dkt. 23.) On October 7, 2025, Terex amended its counterclaims as of right, and Global filed the instant motion on October 28, 2025. (Dkts. 27, 29.) Following a settlement conference, the Court reserved ruling on the motion pending the outcome of further settlement discussions between the parties. The parties have since advised that settlement discussions have ended. Accordingly, the Court treats the motion as ripe for ruling.

## LEGAL STANDARD

### A. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a pleading must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible when the pleaded facts allow "the reasonable inference that the defendant

is liable for the misconduct alleged." Id. In its analysis, the Court accepts well-pleaded facts as true and draws all reasonable inferences in the pleader's favor, but it does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id. at 678–79. The same Twombly standard extends to counterclaims. A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015).

On a motion to dismiss a counterclaim, the Court may consider the pleading, documents attached to or incorporated in it, documents integral to it—that is, those on whose terms and effect the pleader relied heavily—and matters that are otherwise appropriate for judicial notice. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010); Vdare Foundation, Inc. v. James, 162 F.4th 77, 83 (2d Cir. 2025).

**B. Trade Dress Infringement Under Section 43(a) of the Lanham Act**

Section 43(a)(1) of the Lanham Act imposes civil liability on any person or company who, in connection with goods, uses in commerce "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that is "likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship,

or approval of his or her goods, services, or commercial activities by another person . . . ." 15 U.S.C. § 1125(a)(1)(A). It is well established that "trade dress"—a product's overall look, including the design of the product itself—can be a protected "symbol" or "device" within the meaning of the Lanham Act. Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209-10 (2000). Moreover, Section 43(a) may protect trade dress regardless of whether it is registered as a mark. Id. at 210.

To state a claim for infringement of product-design trade dress, a plaintiff must first articulate the specific components of the claimed dress. Cardinal Motors, Inc. v. H&H Sports Prot. USA Inc., 128 F.4th 112, 123 (2d Cir. 2025). The plaintiff must also plead that "(1) its product design is distinctive, (2) there is a likelihood of confusion between its product design and that of the defendant, and (3) its product design is not functional." Id. at 121.

i. Articulation of Trade Dress

The articulation requirement is a threshold pleading requirement in any trade dress infringement suit that is "separate from and in addition to" the elements of an infringement claim. Cardinal Motors, 128 F.4th at 122. A plaintiff satisfies the articulation requirement "by describing with precision the components—i.e., specific attributes, details, and features—that make up its claimed trade dress," such as "materials, contours,

sizes, designs, patterns, and colors." Id. at 124-25. The requirement asks only whether the dress has been identified precisely enough for a court or jury to evaluate the claim. Id. at 125. A plaintiff therefore "may satisfy the articulation requirement even if the components described arguably render the trade dress overbroad, generic, not distinctive, or functional," because those questions go to the merits. Id.

ii. Ownership and Priority

Under the Lanham Act, "trademark rights flow from priority and . . . priority is acquired through use." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 146 (2d Cir. 2007). The first to use a protectable mark to identify its goods in a given market is the senior user and, so long as it continues to use the mark, may exclude later users from that market. Id. at 146-47. Common-law trademark rights likewise "derive from 'initial appropriation and use'" of the mark. Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co., 897 F.3d 413, 418 (2d Cir. 2018) (internal quotation marks omitted).

iii. Distinctiveness

Distinctiveness of a mark may be inherent or acquired. Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc., 696 F.3d 206, 216 (2d Cir. 2012). Color, however, is never inherently distinctive, and neither is product design. Samara Bros., 529 U.S. at 211-13. A plaintiff claiming rights in the

color or design of its product must therefore plead that the claimed feature has acquired secondary meaning. Id. at 216.

Secondary meaning exists when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." Id. at 211 (emphasis added) (internal quotation marks omitted). Relevant factors include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." Louboutin, 696 F.3d at 226 (internal quotation marks omitted). "No single factor is determinative, [] and every element need not be proved." Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985) (internal quotation marks omitted). Ultimately, "[t]he crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source." Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997) (internal quotation marks omitted).

iv. Non-Functionality

The plaintiff bears the burden of pleading that its unregistered dress is not functional. 15 U.S.C. § 1125(a)(3). "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from

instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Sulzer Mixpac AG v. A&N Trading Co., 988 F.3d 174, 181 (2d Cir. 2021) (internal quotation marks omitted). Courts apply a three-part test to determine functionality. First, a court inquires whether a product feature is "essential to the use or purpose of the article" or if it "affects the cost or quality of the article." Louboutin, 696 F.3d at 219. Next, if a product feature is found not to be functional under those first two factors, a court considers aesthetic functionality and asks whether giving the markholder the right to use the feature exclusively "would put competitors at a significant non-reputation-related disadvantage." Id. at 219–20 (internal quotation marks omitted). In short, a mark is aesthetically functional "where protection of the mark significantly undermines competitors' ability to compete in the relevant market." Id. at 222.

Functionality is a question of fact, however, and dismissal on that ground at the pleading stage is ordinarily inappropriate. Muddy Bites, Inc. v. Evergreen USA LLC, No. 24-CV-7089 (LAK), 2025 WL 1079494, at *5 (S.D.N.Y. Apr. 9, 2025) (quoting Deckers Outdoor Corp. v. Next Step Grp., Inc., No. 23-CV-02545 (ALC), 2024 WL 3459609, at *4 (S.D.N.Y. July 18, 2024)). Where a plaintiff alleges that alternative designs would work equally well, such allegations may be probative of non-functionality. Schutte

Bagclosures Inc. v. Kwik Lok Corp., 193 F. Supp. 3d 245, 270 (S.D.N.Y. 2016), aff'd, 699 F. App'x 93 (2d Cir. 2017) (citation omitted).

v. Likelihood of Confusion

Likelihood of confusion is assessed under the eight Polaroid factors: (1) the strength of the senior user's mark, (2) the similarity of the marks, (3) the proximity of the products, (4) the likelihood that the senior user will bridge the gap, (5) evidence of actual confusion, (6) the junior user's good faith in adopting the mark, (7) the quality of the junior user's product, and (8) the sophistication of the relevant consumers. Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). "[C]ourts in this Circuit typically do not conduct a full analysis into the question of 'likelihood of confusion' at the motion to dismiss stage due to its fact-intensive nature." CDC Newburgh Inc. v. STM Bags, LLC, 692 F. Supp. 3d 205, 230 (S.D.N.Y. 2023).

Increasingly, a competitor's alleged purchase of the plaintiff's name or mark as a search keyword is part of the likelihood-of-confusion analysis. See 1-800 Contacts, Inc. v. JAND, Inc., 119 F.4th 234, 249 (2d Cir. 2024). Our Court of Appeals, however, has joined "the consensus view" that "the mere act of purchasing a competitor's trademarks in the context of keyword search advertising does not constitute trademark infringement." Id. at 239. What matters is what the consumer is

actually shown as a result of the keyword, meaning that "in the search advertising context, the similarity-of-the-marks factor should be assessed as it relates to the paid advertisement's appearance on the result page." Id. at 251.

A plaintiff's allegation that a competitor has purchased a search term associated with its mark may ground a theory of so-called initial-interest confusion, in which "potential customers of one website will be diverted and distracted to a competing website." Id. at 247. However, the Court of Appeals "require[s] a showing of intentional deception to sufficiently plead internet-related initial-interest confusion." Id. (internal quotation marks omitted). The Court of Appeals has also apparently left open a claim in which the defendant's only use of the plaintiff's word mark is the keyword purchase but the material displayed to the consumer mimics the plaintiff's trade dress, observing that such a claim "would likely weigh the similarity-of-the-marks factor much more heavily" in the plaintiff's favor. Id. at 251 n.8 (citation omitted).

### C. New York Common-Law Infringement and Unfair Competition Claims

Most of the elements of trademark infringement and unfair competition under New York common law mirror those of the Lanham Act. Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp.

2d 448, 456 (S.D.N.Y. 2005). Common-law infringement thus requires the same showing as Section 43(a) discussed above. See id.[5]

A common-law claim of unfair competition premised on trade dress infringement requires the elements of the Lanham Act claim and, in addition, a showing of bad faith. Genesee, 124 F.3d at 149. Bad faith "may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 389 (2d Cir. 2005).

## DISCUSSION

### A. Articulation of Terex's Claimed Trade Dress

Global contends at the outset that all of the counterclaims in the FAC must fail because Terex does not articulate a claimed trade dress with sufficient particularity. Among other things, Global argues that Terex has not identified a particular shade of Genie Blue or the particular components that bear the color in question. Mot. at 7-14; Reply at 1-8. Terex, however, contends that its enumerated list of colors and arrangements suffices at the pleading stage. Opp. at 6-10.

Terex has the better of the argument. The articulation inquiry asks only whether the pleader has listed the components of its dress with the precision required at the pleading stage.

[5] Some courts in this District have interpreted New York common-law infringement as also requiring bad faith. See, e.g., CDC Newburgh, 692 F. Supp. 3d at 230-31. The Court need not decide whether that is so here, because, as the Court explains, the FAC adequately alleges bad faith.

Global's arguments that the trade dress described in the FAC is overbroad, generic, or inconsistently applied go to the issue of distinctiveness, a merits question that is entirely separate from the articulation pleading requirement. Cardinal Motors, 128 F.4th at 125.

Here, the FAC lists two color components, Genie Blue and gray, and identifies the particular goods to which they are applied. (FAC ¶ 12.) The FAC, as the Court has noted above, also provides several examples of the Genie Blue Scheme across different models of Genie-branded equipment. (Id. at ¶¶ 12-13.) Accordingly, the Court finds that Terex has sufficiently articulated its trade dress for pleading purposes.

### B. Distinctiveness of Terex's Asserted Trade Dress

As noted, Global's objections to the vagueness of the claimed dress are misdirected insofar as they challenge articulation. However, such arguments may be properly raised in challenging the distinctiveness of Terex's claimed mark. A dress claimed at too high a level of generality is, of course, "per se not distinctive and therefore not protectable." Cardinal Motors, 128 F.4th at 122. To that end, Global argues that the FAC merely alleges "a loose mix of blue and gray on 'different sections' of various lifts that could encompass countless configurations," Reply at 1, and that the claim is therefore "pitched at an improper level of generality," Mot. at 7.

The question for the purposes of this motion, however, is not whether Terex will ultimately prove that purchasers can (or will) recognize the Genie Blue Scheme. There is no heightened pleading standard for trade dress, and a pleading will survive dismissal so long as it alleges sufficient facts from which distinctiveness could be inferred. As the Court has noted, the FAC identifies the two colors claimed, the goods to which they are applied, and the general sections of those goods that bear each color. (FAC ¶ 12.)

The authorities that Global cites are not to the contrary. In Int'l Leisure Prods., Inc. v. FUNBOY LLC, the Court of Appeals affirmed dismissal of a claim because the claimed dress "would encompass any bird-shaped pool float," which claimed a subject rather than a design. 747 F. App'x 23, 26 (2d Cir. 2018) (summary order). Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc. likewise concerned a dress described so generally that it was "no more than a concept or idea to be applied to particular products." 58 F.3d 27, 33 (2d Cir. 1995). Here, the FAC alleges a two-color scheme applied in a specified arrangement to identified lifting equipment.[6] Based on the photographs provided in the FAC and the allegations as a whole, the Court concludes that Terex has pleaded

[6] Global also argues that the FAC's own photographs appear to show varying degrees of blues, gray in different places, and one machine bearing white. Mot. at 9-11, 13. But that argument is plainly "evidentiary in nature" and not properly before the Court on this motion. Geigtech E. Bay LLC v. Lutron Elecs. Co., 352 F. Supp. 3d 265, 282 (S.D.N.Y. 2018). To the extent that Global believes that Terex has employed such inconsistent trade dress that it cannot be distinctive, that is a proper subject for discovery and summary judgment.

its trade dress with adequate particularity such that the claimed dress is not per se unprotectable.

Global next argues that the FAC does not plausibly allege secondary meaning in the two-color scheme.[7] Once again, the Court disagrees. The FAC alleges forty years of continuous and exclusive use by Terex and annual United States sales of at least $1 billion. Moreover, Terex alleges that it has first- or second-place market share in every MEWP class in a market where competing equipment is often sold in yellow, orange, and red. (FAC ¶¶ 14–18.) Courts in this District have declined to decide secondary meaning under Rule 12 on far thinner allegations. Kaplan, Inc. v. Yun, 16 F. Supp. 3d 341, 349–350, 352 (S.D.N.Y. 2014). Nor is the absence of a consumer survey or media coverage fatal to Terex's claims, given that a plaintiff is not required to satisfy every single factor to allege distinctiveness. Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1222 (2d Cir. 1987).[8]

[7] Global contends that the FAC's use allegation should be disregarded because it contradicts the original counterclaim. (Mot. at 15–16.) The Court does not agree. The original counterclaim alleged first use of GENIE BLUE in 1985, and the FAC alleges use of the Genie Blue Scheme since the mid-1980s. (Dkt. 18, Countercl. ¶ 23; FAC ¶ 14.) That is far from the blatant contradiction of a prior essential allegation that permits a court to disregard an amendment. See Palm Beach Strategic Income, LP v. Salzman, No. 10-CV-261, 2011 WL 1655575, at *6–7 (E.D.N.Y. May 2, 2011), aff'd, 457 F. App'x 40 (2d Cir. 2012).

[8] Global also asks the Court to take judicial notice of product images from Terex's website, which Global argues show inconsistent application of the Genie Blue Scheme. (Mot. at 11–13 & n.2; Reply at 6–7 & n.4.) Terex objects that the site is neither referenced in nor integral to the FAC and that the cited pages are in fact from Terex's Australian site. (Opp. at 6–7 n.1.) Global concedes the error but says the U.S. site shows the same images. Reply at 6. More fundamentally, Global offers the images to contradict the FAC's allegations of consistent use, which the Court may not do at the Rule 12(b)(6) stage. See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

Ultimately, the degree to which the Genie Blue Scheme has acquired secondary meaning, if at all, is a question of fact that is ordinarily not resolved on a motion to dismiss. Kaplan, 16 F. Supp. 3d at 350. And even if Global is correct that the FAC's concrete allegations of recognition concern the Genie Blue color alone (rather than the combination of Genie Blue and gray), that would still not warrant dismissal. Indeed, that was precisely the case in Louboutin, where the Court of Appeals held that the brand's red-bottom high heels were protectable only in the contrasting application that the public had come to recognize and thus narrowed Louboutin's mark accordingly. 696 F.3d at 227-28. Global is free to make those arguments as this litigation proceeds, but they are neither here nor there at the pleading stage.

### C. Non-Functionality

Global next argues that Terex does not carry its burden to allege non-functionality of its claimed trade dress. To that end, Global contends that Terex's allegations merely recite the standard of TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 32-33 (2001), and that the availability of alternative colors does not negate aesthetic functionality. See Mot. at 17-19.

---

Accordingly, the FAC's own photographs suffice for the purposes of alleging Terex's claimed trade dress. (FAC ¶¶ 12-13.)

Again, the Court disagrees with Global's construction of the FAC. As noted, the FAC specifically alleges that Terex's competitors regularly sell comparable equipment in yellow, orange, and red, as the photographs of the JLG, Haulotte, Skyjack, and Manitou lines reproduced above show, and that Global itself sells manual lifts in yellow and red. (FAC ¶¶ 17, 24-26.) Those allegations plausibly support the inference that exclusivity in blue and gray would not impact essential features of the product or undermine competitors' ability to compete in the lift market. See Louboutin, 696 F.3d at 222.[9] Accordingly, the Court finds that Terex has adequately alleged non-functionality at the pleading stage.

### D. Likelihood of Consumer Confusion

#### i. Theories of Consumer Confusion

Finally, Global contends that Terex has failed to allege a likelihood of confusion. "The Lanham Act protects against several types of consumer confusion, including point-of-sale confusion, initial interest confusion, and post-sale confusion, and the Polaroid factors must be applied with an eye toward each of these." Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d

[9] Global's reliance on Sulzer Mixpac AG, 988 F.3d at 183, a case with which this Court is intimately familiar, is entirely inapposite. In Sulzer, the Court of Appeals found the colors of dental mixing tips signified the tips' diameter and enabled users to match cartridges to the right tip. Id. In other words, the colors signaled a type of measurement on which professionals relied. There is no such allegation here.

532, 537 n.2 (2d Cir. 2005) (internal citations omitted). It is therefore "important to clarify upfront the specific type of consumer confusion alleged" so that the factors may be "evaluated in the context" of the confusion said to be likely. Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc., 307 F. Supp. 3d 260, 285 (S.D.N.Y. 2018) (Nathan, J.).

The Court's first task is thus to identify the type of confusion alleged in the FAC, see 1-800 Contacts, 119 F.4th at 247, a task with which the parties have not provided much aid.[10] The operative allegation in the FAC refers to what appear to be five separate theories offered "without limitation," and neither party's brief develops any particular theory by name. (FAC ¶ 48.) Construed in the light most favorable to Terex, however, the Court discerns at least two theories of confusion that are properly pleaded by the FAC.

First, the FAC plainly alleges a point-of-sale theory of confusion. The infringing use alleged in the FAC is Global's application of the Genie Blue Scheme to its own lift trucks and its sale of those trucks in competition with Terex. (FAC ¶¶ 35–

[10] Off the bat, Global incorrectly suggests that the infringing conduct pleaded in the FAC is the use of the "Genie Lift" trademark in search-term results, which Global observes is not necessarily actionable on its own. (Mot. at 20, 22.) Terex correctly notes, however, that the FAC pleads Global's use of the color scheme itself as the infringing use and merely relies on the search-term purchase to support the likelihood of consumer confusion. Accordingly, the Court rejects Global's invitation to frame this as a standalone search-term case.

38, 42.) The FAC alleges that Global has applied a near-identical dress to identical goods sold to the same customers and that a purchaser is therefore likely to believe that a Global lift comes from Terex. (FAC ¶¶ 36–38, 40.) That is the hallmark of a point-of-sale claim whereby "at the time consumers purchase a good or service . . . they are confused as to the source of the product or service they are purchasing." Alzheimer's, 307 F. Supp. 3d at 286.

Second, the FAC also pleads a species of "initial-interest confusion," in which a consumer searching for a Genie lift on the web is diverted to a Global copycat that appears visually identical, at least in color scheme and design, to a Genie lift. (FAC ¶¶ 37, 48.) Unlike point-of-sale confusion, this theory of confusion requires a "showing of intentional deception to sufficiently plead internet-related initial-interest confusion," 1-800 Contacts, 119 F.4th at 247 (internal quotation marks omitted), separate and apart from the Polaroid factors. Nonetheless, the Court finds that showing to be made on the face of the FAC here.[11]

[11] As to the intentional deception element, the FAC alleges that Global copied the Genie Blue Scheme with actual and constructive notice that it belonged to Terex and then purchased "Genie Lift" as a search term. (FAC ¶¶ 35–37, 45, 67.) In other words, Terex has pleaded specific facts alleging that Global intended for consumers searching for Genie-branded Terex lifts to see and click on a Global lift in Terex's trade dress, thereby denying Terex the prospective customer. At the pleading stage, such allegations are sufficient to sustain an initial-interest theory of confusion. Cf. LoanStreet Inc. v. Troia, No. 21-CV-6166 (NRB), 2022 WL 3544170 at *11 (S.D.N.Y. Aug. 17, 2022) (denying motion to dismiss where plaintiff alleged that "by using 'LoanStreet' as the keyword

Accordingly, the Court will analyze the Polaroid factors under both the point-of-sale and initial-interest theories of confusion.

ii. Polaroid Analysis

A court need not "slavishly recite the litany of all eight Polaroid factors in each and every case," but it is "incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." Nat. Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576, 578–79 (2d Cir. 2005) (internal quotation marks omitted). After considering the Polaroid factors in their totality, the Court finds that Terex has sufficiently alleged a likelihood of consumer confusion.

First, Terex has plausibly alleged a strong mark in its trade dress. "[T]he strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." RiseandShine Corp. v. PepsiCo, Inc., 41 F.4th 112, 120 (2d Cir. 2022) (internal quotation marks omitted). Here, Terex alleges four decades of continuous and exclusive use of the Genie Blue Scheme, annual advertising of $1 million to $4 million devoted to products bearing it, annual United States sales of at least $1 billion, and first- or second-place

that triggers defendant's advertisements, defendant has attempted to divert the very users seeking out the real LoanStreet").

market share in every MEWP class. (FAC ¶¶ 14-18.) Terex's advertising touts Genie Blue itself as the "Color of Confidence." (FAC ¶ 16.) As a whole, those allegations plausibly plead commercial strength, regardless of how consumers in fact perceive Terex's claimed mark.

Second, Terex alleges substantial similarity between its own trade dress and that used on Global's allegedly infringing lifts. As to point-of-sale confusion, the FAC plainly reproduces the parties' lifts side by side and alleges that the schemes are nearly identical. (FAC ¶¶ 36, 38.) For initial-interest confusion, by contrast, "the similarity-of-the-marks factor should be assessed as it relates to the paid advertisement's appearance on the result page." 1-800 Contacts, 119 F.4th at 251. As noted, the FAC provides a screenshot showing that a customer's search for "Genie Lift" will return, as one of the top results, a Global lift using Terex's claimed trade dress. (FAC ¶ 37.) Under either theory, the similarity of the marks strongly favors Terex.

The next three factors, which consider where the parties sit in the market, also favor Terex. As to proximity, the FAC alleges that Global sells hand-operated lift trucks in competition with Terex's lifting equipment and to the same customers. (FAC ¶¶ 35, 38.) With respect to quality, the FAC alleges that Global's lifts are of unknown quality and are sold at a significantly lower price than Terex's. (FAC ¶ 40.) As the senior user, Terex undoubtedly

has an interest in protecting the reputation associated with the Genie brand. Accordingly, this factor also favors Terex.[12]

The remaining factors split evenly. To be sure, the FAC pleads little in the way of actual consumer confusion, and to prevail on that factor at the pleading stage Terex would have to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of it. 1-800 Contacts, 119 F.4th at 253-54 (internal quotation marks omitted). Terex has not done so. But for the reasons discussed above, Terex has plausibly alleged bad faith through its theory that Global has purchased Genie-linked keywords with the intention of showing consumers searching for Terex lifts a competitor product that mimics Terex's claimed trade dress and thus "adopted its mark with the intention of capitalizing on [Terex's] reputation and goodwill." Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001).[13]

Mindful that courts "generally should not treat any single factor as dispositive," Nat. Organics, 426 F.3d at 578, the balance of the Polaroid factors favors Terex. Under either the point-of-sale or the initial-interest theory of confusion, the FAC's

---

[12] Bridging the gap has no application because, "[w]here, as here, the parties produce the same product in the same industry, there is no need to 'bridge the gap.'" Geigtech, 352 F. Supp. 3d at 285.

[13] As to consumer sophistication, the Court may not assume any degree of sophistication that the pleading does not allege. See 1-800 Contacts, 119 F.4th at 254-55. Accordingly, this factor is neutral.

allegations state a plausible likelihood of confusion. Accordingly, the Court declines to dismiss Count One for failure to plead a likelihood of confusion.

**E. New York Common-Law Claims**

Global argues that Counts Two and Three fall with Count One because the FAC pleads neither a protectable dress nor a likelihood of confusion. To the extent Global repeats under the common-law counts the arguments it makes under the Lanham Act, those arguments fail for the reasons stated above, because the parties agree that the common-law claims are governed by the same standards. However, Global also advances three arguments that appear addressed to the common-law claims alone.

First, Global argues that Count Two fails because the FAC does not allege the date, place, and scope of Terex's prior use, and because common-law rights are strictly territorial. (Mot. at 21–22.) However, in the FAC, Terex alleges that it was the first to use the Genie Blue Scheme on lifting equipment and that it has used the Genie Blue Scheme continuously and exclusively throughout the United States (including New York) since the mid-1980s. (FAC ¶¶ 14, 56–57.) Those allegations, accepted as true, establish both the fact and the geographic reach of Terex's prior use, and nothing more is required at the pleading stage.

Second, Global argues that Count Three fails because the FAC pleads neither palming off nor misappropriation and because

selling one's own lift trucks painted blue is lawful competition. Mot. at 23–24. That argument misapprehends New York law. Palming off and misappropriation are merely two species of common-law unfair competition. Indeed, the "classic" form of palming off that Global describes, in which a seller substitutes its own goods when a customer asks for the plaintiff's, is only one example of the tort. See ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 476 n. 2 (2007). Terex need not lay out its precise theory of unfair competition so long as it plausibly alleges that Global has engaged in bad-faith misappropriation that is likely to cause consumer confusion. See Jeffrey Milstein, 58 F.3d at 34–35 ("[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" (citation omitted)). For the reasons the Court has already explained, the FAC does so.

Finally, Global argues that the FAC pleads no facts showing the bad faith necessary to sustain an unfair competition claim. As the Court has explained, the FAC's allegations that Global copied the Genie Blue Scheme with notice of Terex's asserted rights and then purchased "Genie Lift" as a search term—thus ensuring that a look-alike would be shown to a consumer searching for Terex's product—are sufficient to allege plausibly that Global acted in bad faith. See supra n.11.

Accordingly, the motion is DENIED as to Counts Two and Three.

### F. Global's Rule 12(f) Motion to Strike Terex's Affirmative Defenses

Global also moves under Rule 12(f) to strike the three affirmative defenses pleaded in Terex's Answer, which assert failure to state a claim, lack of standing, and a reservation of defenses not yet identified. (Dkt. 23 at 15–16; Dkt. 18 at 43–44.) Under Rule 12(f), the Court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). However, "[m]otions to strike affirmative defenses under Rule 12(f) are disfavored, and the standard for a plaintiff to prevail is demanding." Trs. of N.Y.C. Dist. Council of Carpenters Pension Fund v. M.C.F. Assocs., Inc., 530 F. Supp. 3d 460, 464 (S.D.N.Y. 2021). "To prevail on a motion to strike affirmative defenses, a plaintiff must show that '(1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by the inclusion of the defense.'" Miura Run, Inc. v. Triple Play Pay, Inc., No. 25 Civ. 10425 (RA), 2026 WL 1346268, at *2 (S.D.N.Y. May 14, 2026) (quoting GEOMC Co. v. Calmare Therapeutics Inc., 918 F.3d 92, 96 (2d Cir. 2019)). Thus, "[a] factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by

expanding the scope of the litigation." GEOMC Co., 918 F.3d at 99.

Global suggests that failure to state a claim is not a cognizable affirmative defense at all and belongs in a motion rather than an answer. However, "[i]t is well settled . . . that a failure-to-state-a-claim defense can properly be asserted as an affirmative defense in an answer." Coach, Inc. v. Kmart Corps., 756 F. Supp. 2d 421, 432 (S.D.N.Y. 2010). Separately, Global contends that Terex pleads no facts suggesting an absence of Article III standing. However, "the application of Twombly . . . is 'context-specific' and courts generally apply a lower plausibility threshold considering the timeline to answer a complaint and the availability to a defendant of facts underlying the affirmative defense." Miura Run, 2026 WL 1346268, at *2. Given that Terex elsewhere contests certain allegations relevant to the issue of standing, the Court will allow the defense to proceed at this stage.

Accordingly, Global's motion to strike Terex's affirmative defenses is DENIED.

**CONCLUSION**

For the foregoing reasons, Global's motions to dismiss the FAC and strike Terex's counterclaims are DENIED. The Clerk of the Court shall close the motions at Dkts. 23 and 29.

Within seven days of this Opinion and Order, the parties shall inform the Court by joint letter how they propose to proceed.

**SO ORDERED.**

Dated: New York, New York
September 30, 2026

Loretta A. Preska
________________________________
LORETTA A. PRESKA
Senior United States District Judge